## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOHN CHRISTIE,<br><br>Plaintiff,<br><br>v.<br><br>MODERN MANUFACTURING AND ENGINEERING, INC. and HUE VAN LIEN,<br><br>Defendants. | Civil No.  16-3014 (JRT/BRT)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

Nathaniel F. Smith and Susan M. Coler, **HALUNEN LAW**, 80 South Eighth Street, Suite 1650, Minneapolis, MN  55402, for John Christie.

James F. Baldwin, **MOSS & BARNETT, PA**, 150 South Fifth Street, Suite 1200, Minneapolis, MN  55402, for defendants.

This case involves an action for damages and civil penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").  Relator John Christie, on behalf of the United States, alleges that Modern Manufacturing and Engineering, Inc. ("MME") and its owner Hue Van Lien (collectively "Defendants") falsely represented that MME followed required quality control processes in manufacturing parts to fulfill government contracts and subcontracts and falsely represented MME's status as a Small Disadvantaged Business ("SDB") for purposes of government contracting.  Presently before the Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

Because Christie fails to plead allegations of fraud with sufficient particularity, the Court will grant Defendants' motion and dismiss the action without prejudice.

## BACKGROUND

## I.     FACTUAL BACKGROUND[1]

Relator John Christie has been working for MME as a parts inspector since 2013, inspecting parts to ensure compliance with contractual requirements.  (Compl. ¶¶ 11, 77, Sept. 7, 2016, Docket No. 1.)   MME is a manufacturing company with its principal offices in Brooklyn Park, Minnesota.  (*Id.* ¶ 14.)   MME provides "milling, turning, and engineering services to a variety of contracting partners, including Alliant Techsystems (ATK), L3 Communications, Lockheed Martin, and Rockwell Collins" and manufactures parts used for aerospace, commercial, military, and medical applications.  (*Id.* ¶ 12.) MME reported about $21 million in sales for 2012, and Christie estimates that 50 percent of its sales are to the Government.  (*Id.* ¶ 13.)  Hue Van Lien is the owner and CEO of MME.  (*Id.* ¶ 15.)  He is an Asian Pacific American.  (*Id.*)

### A.     Government Compliance Regulations

#### 1.     Inspection Standards

The United States requires its contractors to meet various inspection standards, such as the Federal Acquisition Regulations ("FAR").  (*See id.* ¶¶ 29-33.)   Contracts involving "complex or critical items" require compliance with higher-level quality

---

[1] The Court assumes for purposes of the present motion that all factual allegations in Christie's complaint are true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

standards, which include a parts-inspection requirement dictated by MIL-STD-1916.  (*Id.* ¶¶ 35-39.)   MIL-STD-1916 is the currently approved Department of Defense Test Methods Standard for Acceptance of Product.  (*Id.* ¶ 45.)  When referenced in a contract, MIL-STD-1916 applies to the prime contractor "and should be extended to subcontractors or vendor facilities."  (*Id.* ¶ 47.)  It requires contractors "to submit deliverables that conform to requirements and to generate and maintain sufficient evidence of conformance."  (*Id.* ¶ 48 (quoting MIL-STD-1916 Foreward, ¶ 7).)

MIL-STD-1916 requires contractors to perform sampling inspection in accordance with certain standards unless the contractor has submitted an alternate acceptance method.  (*Id.* ¶ 50 & n.3.)   Section 4.2 sets out various sampling plans, indexed by verification levels and lot or production interval size.  (*Id.* ¶¶ 50-52.)  The purpose of inspecting sample sizes is to identify nonconforming units and implement corrective action for that portion of the lot to ensure that the government receives "only products that conform with all contract requirements and specifications."  (*Id*. ¶¶ 55-58.)

## 2.  Verification of Conformance

Government contracts require verification of conformance under 48 C.F.R. § 52.246-15 in the form of a Certificate of Conformance.  (*Id.* ¶ 40.)  In some cases, the FAR allows these certificates to be used instead of source inspection at the discretion of the contracting officer.  (*Id.* ¶ 41 (citing FAR § 46.504).)

## 3.  Small Disadvantaged Business Status

Federal regulations require contractors intending to do business with the Government to submit and maintain accurate information in a central database called the

System for Award Management ("SAM").  (*Id.* ¶ 60.)  The SAM record "includes a series of representations and certifications by the participating business to verify eligibility to bid on federal government contracts set aside for small businesses of various types."  (*Id.* ¶¶ 62-63.)  For a business claiming SDB status, the SAM record includes a certification that the business is SDB certified by the Small Business Administration ("SBA") and that "no material change in disadvantaged ownership and control has occurred since [the business's] certification."  (*Id.* ¶ 64 (quoting FAR § 52.212-3(c)(10)(i)(A)).)

To qualify as an SDB, a company must show that it is controlled by a socially and economically disadvantaged individual.  (*Id.* ¶ 72 (citing 15 U.S.C. § 637(a)(4); 13 C.F.R. § 124.1002(b)(3)).)  Asian Pacific Americans are presumed to be socially disadvantaged.  (*Id.*)  To qualify as economically disadvantaged, an individual must show diminished capital and credit opportunities.  (*Id.*)

Using the SAM, the SBA generates an internal database of small businesses called the Dynamic Small Business Search ("DSBS").  (*Id.* ¶ 67.)  Government entities use the SAM and the DSBS to identify potential businesses that meet requirements for particular government contracts and to publish solicitations for bids in databases that are accessible to SAM-registered entities.  (*Id.* ¶¶ 68-69.)  Vendors submitting bids on government contracts must include relevant representations and certifications, including status as an SDB, either in the bid or through its SAM record.  (*Id.* ¶¶ 70-71.)  Any time a business willfully seeks and receives an award intended for SDBs by misrepresentation, there is a presumption of loss to the United States based on the total amount expended on the contract or subcontract.  (*See id.* ¶ 71 (citing 15 U.S.C. § 632(w)(1)).)

### B.     Allegations of MME's Non-Compliance

#### 1.     Failure to Inspect

When Christie first began working for MME, he was trained by a fellow inspector, Ben Jones.  (*Id.* ¶ 82.)  Jones told Christie that he should not inspect the number of units required under MIL-STD-1916, but only 2-5 units, and "even that takes too long."  (*Id.*)  MME's quality manager, Dan Lopez, also told the inspectors, including Christie, to inspect 2-5 units, if any, of any lot production.  (*Id.* ¶ 83.)  Lopez made clear to Christie that MME's top priority was to ensure that parts were shipped as quickly as possible so that MME could get paid.  (*Id.*)  He told Christie, "If we did proper inspections, then we would never get our parts out the door."  (*Id.*)  Christie's supervisor, Dan Rodamacker, "routinely reprimands [Christie] for working 'too slow,' because [he] conducts his lot inspections as required by MIL-STD-1916."  (*Id.* ¶ 84.)  Rodamacker "continuously pressures [Christie] to work faster and uses intimidating tactics to force [him] to comply with [MME's] directive to inspect fewer than the required number of parts in various lots."  (*Id.*)  Rodamacker has even threatened his job security.  (*Id.*)

Christie refers to Job #153342 as representative of his allegations.  (*Id.* ¶ 90.)  The inspection for that job required inspection of 11 units from an initial lot size of 110 units.  (*Id.*)  An "In-process Inspection Sheet," which allows inspectors to track their findings on each unit inspected, was filled out for Job #153342, but only two columns – representing two units – were filled out.  (*Id.* ¶¶ 89-92.)  The final job size of 124 units required a final inspection of 12 units under MIL-STD-1916, and the "Final Inspection Report & Record" noted in the "quantity inspected" row that 12 units had been inspected.  (*Id.* ¶ 91.)  Only 2

units of that lot were ever inspected, and the "lot was ultimately submitted for use by the U.S. government with a Certificate of Compliance stating that MME's parts met all contractual requirements and specifications, when [they] in fact did not." (*Id.* ¶ 92.)

Christie "has observed this pattern of conduct throughout his employment" with MME. (*Id.* ¶ 93.) He has observed his supervisors "throwing reject forms for parts into the wastebasket, thereby allowing those parts to be included in lots delivered to the contractor." (*Id.* ¶ 94.) MME has not inspected the machines it uses to manufacture parts for compliance, which violates required quality assurance processes and makes it "more likely that non-conforming parts would be presented to the government." (*Id.* ¶ 95.) MME hides non-conforming parts when they are discovered, sends out units not within specification requirements even when supervisors are on notice of the non-conformities, and signs off on non-conforming parts to expedite delivery. (*Id.* ¶¶ 96-100.)

### 2. False Certifications

In addition to the false certificate of compliance sent out for Job #153342, Christie alleges that the certificates sent with all government lots were false because Defendants failed to properly inspect as required by MIL-STD-1916. (*Id.* ¶¶ 102-104.)

### 3. Misrepresentation of MME's Status as an SDB

"Every page but the home page" of MME's website represents that it is registered as an SDB, but MME was only so registered from January 2008 to January 2011. (*Id.* ¶ 106.) MME's SAM profile states in one section that it is an SDB but states in another section that it is not. (*Id.* ¶ 107.) The former section is "set aside for use by those entities claiming disadvantaged status," thus MME's completion of that section is "a

misrepresentation of MME's status." (*Id.*)   Also, Lien does not meet the requirements to

claim status as owner of an SDB.  (*Id.* ¶ 108.)  Lien owns assets whose value exceeds the

SBA's threshold for economically disadvantaged status, and Lien has not had difficulty

accessing capital and credit opportunities.  (*Id.* ¶¶ 109-110.)  Christie alleges that "[i]t is

likely that Defendants' misrepresentation that MME is [an SDB] has resulted in receiving

contracts or purchases intended for actual [SDBs]," because prime contractors are

required to use SDBs as sub-contractors in certain Government contracts.  (*Id.* ¶ 111.)

## II.     PROCEDURAL BACKGROUND

Christie brought this action under the FCA on September 7, 2016.  (Compl.)  The

United States declined to intervene.  (Gov't Notice of Election to Decline Intervention,

Aug. 1, 2017, Docket No. 11.)  Defendants filed a motion to dismiss, (Defs.' Mot. to

Dismiss, Oct. 20, 2017, Docket No. 19), which Christie opposes, (Opp'n Mem., Nov. 13,

2017, Docket No. 30).

## DISCUSSION

## I.      STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure

12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the

complaint states a "claim to relief that is plausible on its face."  *See, e.g.*, *Braden v. Wal-*

*Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than

"'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it need not accept as true legal conclusions couched as factual allegations.  *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  A claim "stops short of the line between possibility and plausibility" and must be dismissed when the facts pled "are 'merely consistent with' a defendant's liability."  *Id.* (quoting *Twombly*, 550 U.S. at 557).

### A.    The False Claims Act

The FCA creates civil liability to the United States for someone who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B) . . . .

31 U.S.C. § 3729(a)(1).  The FCA allows a private person to bring a so-called "qui tam" civil action for violation of this section in the name of the United States Government.  *Id*. § 3730(b)(1).  The Government may choose to intervene in the proceeding, or may notify the court that it declines to take over the action.  *Id*. § 3730(b)(2), (b)(4)(B).

### B.    Rule 9(b)'s Heightened Pleading Requirement

Under Federal Rule of Civil Procedure 8(a)(2), plaintiffs need only plead "a short and plain statement of the claim showing that [they are] entitled to relief."  However, a heightened pleading standard applies to fraud claims.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed.

R. Civ. P. 9(b).   Rule 9(b) applies to FCA claims.   *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009).   Accordingly, an FCA complaint "must identify who, what, where, when, and how." *Id.* (quoting *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003)).   A relator must plead facts such as "the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 (8th Cir. 2014).

The purpose of the heightened pleading requirement is to give defendants notice of the particular misconduct alleged so that they can defend against specific charges and not just generally deny wrongdoing.   *Costner*, 317 F.3d at 889.   Particularity allows defendants to investigate, retrieve contemporaneous documents, call contemporaneous witnesses, and hire experts to testify regarding specific incidents. *See id.*   Scrupulous adherence to the heightened pleading standards is especially important in FCA claims to prevent qui tam plaintiffs from filing suit as a pretext to uncover unknown wrongs. *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 559 (8th Cir. 2006).

## II.     SUFFICIENCY OF CHRISTIE'S COMPLAINT

Christie's complaint fails the heightened pleading requirements of Rule 9(b) because his allegations are not sufficiently particular as to the actual filing of false claims for payment from the government.

### A.     Failure to Inspect and Submission of Certificates of Conformance

Christie's allegations lack the required particularity.  In *Roop*, a relator's complaint lacked particularity when it alleged generally that a company's blood glucose monitors and test strips were defective, that the company knew as much and failed to file reports of defects as required by federal reporting regulations, and that – as a result – Medicare paid fraudulent reimbursement claims submitted by the company's distributors. 559 F.3d at 820.  Christie's complaint similarly lacks particularity.  He alleges that the parts MME produced were not in compliance with inspection standards, that MME knew as much yet certified them anyway, and that – as a result – the United States paid for claims that were fraudulently submitted.  But "[l]iability under the FCA attaches 'not to the underlying fraudulent activity, but to the claim for payment.'"  *Thayer*, 765 F.3d at 916 (quoting *In re Baycol Prods. Litig.*, 732 F.3d 869, 875 (8th Cir. 2013)).  Christie fails to provide details regarding the time, place, and content of the MME's false claims for payment, as well as who filed the false claims and what was obtained as a result.  *See id.* Even Christie's allegations about Job #153342 lack most of these details.

A qui tam plaintiff alleging a systematic practice of submitting fraudulent claims must provide "**some** representative examples" in the complaint to satisfy Rule 9(b). *Joshi*, 441 F.3d at 557.  Alternatively, "a relator can satisfy Rule 9(b) without pleading representative examples of false claims if the relator can otherwise plead the 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  *Thayer*, 765 F.3d at 918 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

Christie's allegations fail under both standards.   Christie appears to use Job #153342 as an attempt to satisfy the "representative examples" requirement.   He alleges that Job #153342 was not properly inspected and that an inspection record was created representing that it had been.   Christie alleges that "[t]his lot was ultimately submitted for use by the U.S. government with a Certificate of Compliance stating that MME's parts met all contractual requirements and specifications, when in fact it did not."   (Compl. ¶ 92.)   These allegations are insufficiently particular.   Representative examples must specify time, place, and content of the false representations, details of the fraudulent acts, when the acts occurred, who engaged in them, and what was obtained as a result.   *Joshi*, 441 F.3d at 556-57.   The Complaint does not allege when Job #153342 occurred, who failed to inspect, what the lot consisted of, who falsely filled out the Final Inspection Report & Record, who submitted the lot along with a Certificate of Compliance, when the lot and Certificate were submitted, or what payment MME obtained as a result. Christie's allegation that the lot was "submitted for use by the U.S. government," (Compl. ¶ 92), is unsupported by any further facts or details.   Christie is an inspector.   He does not work in shipping, logistics, billing, accounting, or contract administration/documentation.   Nor does he allege that he has first-hand knowledge of any of these aspects of Job #153342.

In addition to lacking sufficiently pled representative examples, Christie's allegations also lack "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Thayer*, 765 F.3d at 918 (quoting *Grubbs*, 565 F.3d at 190).   In *Thayer*, the relator was

the center manager of two clinics, oversaw their billing and claims systems, and "was able to plead personal, first-hand knowledge of [their] submission of false claims." *Id*. at 917. Thus, her claims regarding the clinics she managed were supported by sufficient indicia of reliability. *Id.* at 919. That is not the case here. Christie pleads first-hand knowledge of inspection practices but not of filing claims. Christie has not alleged first-hand knowledge of MME's shipping system, billing system, certification of lots, or acceptance and fulfillment of **any** contracts, much less Government contracts. In *Thayer*, the relator's allegations regarding hospitals that she did **not** manage lacked sufficient indicia of reliability because she did not have first-hand knowledge of those hospitals' billing processes; she could only speculate. *Id*. at 919-20. Likewise, Christie's allegations regarding false claims to the government are speculative. *See id.*; *see also United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC¸* 135 F. Supp. 3d 944, 960-61 (D. Minn. 2015) (relators had personal knowledge of the defendants' inner business workings, billing practices, and submission of false claims).

A further deficiency of Christie's complaint is that it fails to allege that MIL-STD-1916 is universally required in government contracts. The Complaint states that MIL-STD-1916 applies to contracts "when referenced." (Compl. ¶ 47.) Because Christie's allegations lack specificity, it is impossible for Defendants or the Court to determine which inspection requirements applied to which contracts, whether those requirements were followed, and whether a false claim was submitted with regard to those contracts.

Christie's allegations regarding failure to inspect machines, concealment of non-conforming parts, and shipment of defective units are also insufficiently specific.

Christie does not allege which machines MME failed to inspect, which parts were produced by those machines, which contracts were fulfilled with those parts, what requirements applied to those contracts, what certificates were sent along with the parts, who sent the certificates, when the certificates were sent, or what payment MME obtained as a result.  He does not allege with any specificity which parts were non-conforming or defective, which contracts were fulfilled with those parts, what requirements applied to those contracts, what certificates were sent along with the parts, who sent the certificates, when the certificates were sent, or what payment MME obtained as a result.

Because Christie's allegations regarding failure to inspect and submission of false certificates of conformance do not allege fraud with particularity, the Court will dismiss the action without prejudice.

### B.     Small Disadvantaged Business Status

Christie's allegations regarding MME's misrepresentation of its status as an SDB likewise fail to meet Rule 9(b)'s heightened pleading standard because he has not alleged with particularity that any government contracts were actually obtained as a result of this alleged misrepresentation.   Christie alleges that "[i]t is **likely** that Defendants' misrepresentation that MME is [an SDB] has resulted in receiving contracts or purchases intended for actual [SDBs]."   (*Id.* ¶ 111 (emphasis added).)   In support of this supposition, he alleges only that prime contractors are required to use SDBs as sub-contractors in certain Government contracts.   (*Id.*)   These allegations are not particularized enough to meet Rule 9(b)'s heightened standard.  Christie has not alleged

-13-

what contracts were fraudulently obtained as a result of this status, when they were obtained, or what payment MME received as a result.  He also does not allege that MME's status as an SDB was material to any payment decision.  *See United States ex rel. Johnson v. Golden Gate Nat'l Senior Care, L.L.C.,* 223 F. Supp. 3d 882, 891 (D. Minn. 2016) ("[M]isrepresentation about compliance with a statutory, regulatory, or contractual requirement must be **material** to the Government's payment decision in order to be actionable under the [FCA]." (alteration in original) (quoting *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016))).

Because Christie does not plead particular details regarding any claim for payment made in connection with SDB status, this claim also fails.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 19] is **GRANTED** and this action is **DISMISSED without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  July 3, 2018                                    _____ s/John R. Tunheim _____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                                          Chief Judge
                                                           United States District Court